THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRANCE A. HILL     )
           )
   Plaintiff,    )
           )  Case No. 09 C 6603
           )
   v.        )  Magistrate Judge
           )  Arlander Keys
           )
MICHAEL J. ASTRUE,    )
Commissioner of the Social  )
Security Administration,   )
           )
   Defendant.    )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Terrance A. Hill moves this Court for summary
judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse the final decision of the Commissioner of
the Social Security Administration (Commissioner), who denied his
claim for a Period of Disability (POD) and Disability Insurance
Benefits (DIB). *See* 42 U.S.C. § 401 *et seq.* (West 2008). In the
alternative, Plaintiff seeks an order remanding the case to the
Commissioner for additional proceedings. Defendant moves to
affirm the decision of the ALJ that Plaintiff is not disabled.
For the reasons set forth below, the Court denies Plaintiff's
motion and grants that of the Defendant.

### **Procedural History**

On February 7, 2007, Mr. Hill filed an application for a POD
and DIB, alleging disability beginning January 13, 2007. (*Id.* at

78-9.) He asserted that a broken/crushed right ankle, a staph infection in his right leg, and a rod in his left tibia and thigh rendered him disabled. (*Id.* at 156.) His claims were initially denied on July 3, 2007. (*Id.* at 80-3.) On August 8, 2007, Plaintiff filed a Request for Reconsideration, which was denied on September 25, 2007. (*Id.* at 84-9.)

On November 20, 2007, Mr. Hill requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 90.) A hearing was held on February 6, 2009, before ALJ S. Charles Murray. (*Id.* at 39-77.) Following the hearing, the ALJ issued an unfavorable decision, finding Plaintiff not disabled from January 13, 2007, through March 27, 2009, the date of the ALJ's decision. (*Id.* at 13-24.) Plaintiff subsequently filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council (Appeals Council). (*Id.* at 9-12.) However, the Appeals Council denied the request on August 21, 2009. (*Id.* at 2.) Consequently, the ALJ's decision stands as the final administrative determination of the Commissioner. (*Id.*)

## Factual History

### 1. Plaintiff's Testimony

Terrance Hill testified that he was born on January 4, 1964, and was 45 years old at the time of the hearing. (*Id.* at 44.) He stands approximately 5 feet 10 inches tall and weighs 205 pounds; he has gained weight as a result of being physically

2

inactive. (*Id.*) He is married and has three children. (*Id.* at 44-5.)

Mr. Hill stated that he completed one year of college. (*Id.* at 45-6.) In 2002 or 2003, he left his employment with Delta Air Lines and began a commercial cleaning business with his brother. (*Id.* at 46-7.) In 2006 or 2007, he began working for U.S. Air Cargo as a ramp agent. (*Id.* at 52.) In that capacity, he used machinery to load cargo onto airplanes and would sometimes be required to enter the crawl space of an airplane and place packages there. (*Id.* at 52, 68.) He maintained his cleaning business throughout this period and continued to operate it as of the day of his hearing, though his role at that time was limited to resolving issues over the telephone. (*Id.* at 46, 60.)

In 2007, Mr. Hill was involved in a tragic car accident. (*Id.* at 46-8.) Though he survived, his ankle was crushed. (*Id.* at 48.) And if this were not bad enough, he subsequently developed a staph infection in it. (*Id.* at 49.) As a result, his doctors removed the cartilage from his ankle and foot. (*Id.*) The problems and surgeries did not stop there, however. Indeed, Mr. Hill also had to have a pump placed in his leg to circulate the blood from his foot. (*Id.* at 49-50.) But this did not fully remedy the problem, as he continues to suffer from circulation problems daily, as often as every thirty minutes. (*Id.* at 53.) When the troubles arise, he must elevate his right leg over his

3

heart and left knee until his leg becomes numb (approximately thirty minutes later); he does this twenty to thirty times each day, and must even do so at night. (*Id.* at 53-5, 66.) Mr. Hill's ankle also swells and remains swollen for approximately one hour, four to five times each day. (*Id.* at 55.) To alleviate this, he uses ice packs and takes Tylenol; he also uses ice to relieve ankle stiffness. (*Id.* at 55-6.) His ankle is not tender, though there are parts of it on which he can feel nothing. (*Id.*) Additionally, his foot tingles. (*Id.* at 62.) Mr. Hill testified that he also experiences pain as a result of severe arthritis in his ankle. (*Id.* at 51, 66.) On most days the pain is a level seven on a scale of ten. (*Id.* at 51.) However, the Percocet that he takes for the pain, though it makes him drowsy, causes it to decrease to a level five. (*Id.* at 51-2.)

These impairments have and continue to adversely affect Mr. Hill's life. He is no longer able to drive because his ankle prohibits him from engaging the accelerator and brake. (*Id.* at 45.) He also must use his doctor-prescribed cane to ambulate. (*Id.* at 49-50, 62.) And even then, he walks with a slight gait and is capable of walking for about twenty to twenty-five minutes – or one block – only if he stops and takes a break after walking for five to ten minutes, or 100 feet. (*Id.* at 50, 56-7.) Similarly, though he used to cook, he is no longer able to

4

because of the amount of walking and standing required to do so.
(*Id.* at 62-3.)   Nor can he do laundry because he cannot carry a
laundry basket and use his cane at the same time.   (*Id.* at 63.)

Fortunately, Mr. Hill has not lost all ability to perform
tasks.  He experiences no difficulty climbing stairs.  (*Id.* at
68.)  He is still able to dress himself and tie his shoes.  (*Id.*
at 63.)  He can also lift twenty-five to thirty pounds, off and
on, for two and a half hours.  (*Id.* at 61.)   He cannot carry
anything, however, as it would cause him to lose his balance; he
also is unable to push and pull objects.  (*Id.* at 61-2.)  He can
sit for at least an hour at a time.  (*Id.* at 53.)

As a result of a confluence of factors, Mr. Hill began
suffering from depression in April 2008.  (*Id.* at 63-4.)  He
experiences bouts of crying once or twice a week, with each one
lasting five to ten minutes; reading the Bible and meditating
helps the spells to pass.  (*Id.* at 65.)  He also experiences
anxiety attacks two to three times each day; during those times
he cries, shakes, and is unable to catch his breath.  (*Id.* at 65-
6.)  He sleeps for only three hours at night.  (*Id.* at 66.)

Mr. Hill testified that he has difficulty concentrating.
(*Id.* at 67.)  In fact, he is unable, even, to finish a book.
(*Id.*)  He also has a tendency to forget things, though he does
not do so as often as he did in the past.  (*Id.*)  And his
attention span either increases or decreases depending on what is

going on in his life. (*Id.*)

Mr. Hill's social life has also suffered. For instance, while he enjoys going to the movies, he has been unable to go because of the lack of handicapped seating. (*Id.* at 57-8.) He still attends church but must sit at the front of the church and remain seated for the duration of the service. (*Id.* at 58.) And shopping is possible only if he is able to drive one of the motorized carts throughout the store. (*Id.* at 58-9.)

## 2. **Vocational Expert's Testimony**

Mr. William Wayne Porter, a vocational expert (VE), testified at Mr. Hill's hearing. (*Id.* at 68.) He stated that Mr. Hill's work as a ramp agent is equivalent to an airport utility worker, as defined by the Dictionary of Occupational Titles (DOT); the work is heavy and semiskilled. (*Id.* at 69.) He indicated that Plaintiff's work for his commercial cleaning service was equivalent to a janitorial supervisor; this constitutes medium skilled work. (*Id.* at 70.) The transferable skills from this job include "coordinating, analyzing, compiling, [and] computing of data." (*Id.*)

The ALJ described to Mr. Porter a hypothetical individual of Mr. Hill's age, and with his education and previous work experience. (*Id.*) He then offered the following limitations: a medium exertional level; ability to occasionally climb ropes, ladders, and scaffolds and crawl, crouch, stoop, balance, bend,

6

and twist at the waist; ability to frequently climb ramps and stairs and kneel; and occasional use of a cane for ambulation. (*Id.* at 70-1.) Additionally, the ALJ indicated that the person's attention and concentration throughout the workday is fair – limited but satisfactory. (*Id.* at 71.) Finally, the individual's ability to maintain a regular work schedule is moderately limited – while it affects his ability to function, it does not preclude it. (*Id.*)

Mr. Porter testified that, given these limitations, the hypothetical individual could not perform the past work of Mr. Hill. (*Id.*) Mr. Porter further opined that the individual could not engage in medium or light work, but that sedentary work could be performed. (*Id.*) Specifically, he stated that the person could perform work as an office clerk or sorter, of which there are approximately 26,000 jobs nationally for each occupation; a clerical compiler, of which there are approximately 10,000 jobs nationally; or a registration clerk, of which there are 14,000 jobs nationally. (*Id.* at 71-2.)

The ALJ then questioned whether the same individual could perform work where the exertional level is light and there is a sit/stand option at will, in which the hypothetical individual has the ability to stand for at least thirty minutes and sit for at least an hour and a half. (*Id.* at 72.) Mr. Porter responded that the person could perform neither the past work of Mr. Hill

nor work at the light level. (*Id.*) He could, however, perform any one of the four afore-mentioned jobs. (*Id.* at 72-3.)

Next, the ALJ asked Mr. Porter to consider the following hypothetical: "[s]edentary; should avoid climbing ropes, ladders, and scaffolds; occasional ramps and stairs; moderately limited ability to maintain attention and concentration throughout the workday; avoid crawling, crouching; occasional stooping, kneeling, and balancing; moderately limited ability to handle work related stress and maintain a regular work schedule." (*Id.* at 73.) Mr. Porter testified that, while the individual is incapable of performing Mr. Hill's past work, he could perform the four jobs previously discussed. (*Id.*)

The ALJ offered a final hypothetical: "sedentary; avoid all climbing; avoid crawling, crouching, stooping, balancing; occasional kneeling." (*Id.*) Additionally, "the person has a sit stand option at will; poor ability to maintain attention and concentration because of pain; poor ability to handle work related stress and maintain a regular work schedule." (*Id.*) Mr. Porter stated that, not only could the individual not engage in Mr. Hill's past work, there were no other jobs that he could perform. (*Id.*)

Plaintiff's counsel asked Mr. Porter whether a person of the same age and with the same education and work experience as Mr. Hill could perform work if "[t]otal sitting time in a work –

8

eight-hour work hour day, 30 minutes; total standing walking time in an eight-hour workday period, two hours." (*Id.* at 74.) Further, the hypothetical individual is capable of lifting or carrying ten pounds occasionally and five pounds frequently. (*Id.*) The person is unable to use his right foot for repetitive movement and must elevate his legs above his heart several times each day. (*Id.*) Finally, the individual cannot squat, climb, or crawl and takes medication that interferes with his work schedule. (*Id.*) Mr. Porter responded that the hypothetical person would not be capable of engaging in any type of work. (*Id.*)

## 3. **Medical Evidence**

Mr. Hill submitted medical records to the ALJ detailing his treatment. The Court will discuss these records in full.

### A. *Emory Healthcare*

On February 7, 2007, Mr. Hill visited Emory Family Medicine for a follow-up after his motor vehicle accident. (*Id.* at 203, 206.) He complained of, *inter alia*, insomnia and discharge from the pinholes in the external fixation device on his right leg. (*Id.* at 203.) He told the treating physician that he had been experiencing difficulty sleeping since his accident. (*Id.*) For example, he would wake after approximately one hour of sleep and would have trouble falling back to sleep. (*Id.*) He stated that he spent his days attending physical therapy and watching

9

television. (*Id.*) The doctor noted that there was a superficial yellowish discharge around the pins of the external fixation in Mr. Hill's right leg; Mr. Hill did not experience pain, redness, or swelling. (*Id.*) His ankle was also swollen, though he stated that the swelling had lessened. (*Id.*) The physician indicated that Mr. Hill's insomnia was secondary to the car accident and his right leg with the external fixation. (*Id.* at 204.) Mr. Hill was advised to increase his activity level during the day and also take a prescription medication, Ambien, before bedtime. (*Id.*) He was instructed to continue taking antibacterial medication and to also see an orthopedic surgeon to address the discharge issues that he was experiencing. (*Id.*)

Mr. Hill visited Emory Family Medicine on August 8, 2007, seeking a referral to an orthopedic physician. (*Id.* at 226-27.) At the time, he indicated that his right ankle continued to swell and that he experienced pain in his right foot when he put weight on it. (*Id.*) Dr. Giuyang Li noted that there was swelling present in Mr. Hill's right lower extremity and minor edema in his right ankle, but no tenderness. (*Id.*) Mr. Hill was referred to orthopedics and instructed to follow-up with the family medicine clinic as needed. (*Id.*)

Mr. Hill was seen at the Emory Orthopaedics Center on September 5, 2007. (*Id.* at 229.) He complained of chronic right ankle pain, as well as recurrent swelling and stiffness. (*Id.* at

229, 334.) Indeed, the pain and stiffness had prevented Mr. Hill from returning to work. (*Id.*) He indicated that he had not had any physical therapy, formal or otherwise. (*Id.*) Dr. Brandon Mines noted that Mr. Hill's right ankle had "significant stiffness and poor range of motion with dorsiflexion, plantar flexion, as well as inversion and eversion." (*Id.*) Despite the stiffness, however, Dr. Mines opined that Mr. Hill's overall strength was appropriate. (*Id.* at 230.) Additionally, there was "some tenderness to mild to moderate palpation throughout the talocrural joint, but more so in the anterior aspect." (*Id.* at 229-30.) And from the x-rays, Dr. Mines gathered that Mr. Hill showed signs of hallux rigidus of the right great toe and osteoarthritic changes in his ankle joint. (*Id.*) Mr. Hill was told to follow-up with his surgeon, Dr. Sameh A. Labib, for additional consultation and management. (*Id.*)

On September 25, 2007, Mr. Hill visited Dr. Labib in an effort to learn of any available options for handling the significant pain and dysfunction that he was experiencing. (*Id.* at 299-300.) Dr. Labib noted that Mr. Hill suffered from osteoarthritic changes in his right ankle. (*Id.*) He diagnosed Mr. Hill as definitively suffering from severe ankle osteoarthritis and possibly suffering from ankle osteomyelitis, as well as a right tibia pin site infection. (*Id.* at 301.) Mr. Hill was told to follow-up in three weeks and to be weight

bearing as tolerated. (*Id.*)

Mr. Hill returned to the clinic on October 16, 2007, after having a bone scan and a white blood cell scan. (*Id.* at 291.) He indicated that his right ankle symptoms had not changed for the better or worse. (*Id.*) The pain in his right foot was a level five on a scale of ten. (*Id.* at 292.) The bone scan revealed possible osteomyelitis in Mr. Hill's right ankle; the white blood cell scan was negative for infection. (*Id.* at 292, 326.) A physical exam revealed that the range of motion of his toes (in both his left and right foot) was normal, as was the range of motion of his feet. (*Id.* at 292.) Additionally, Mr. Hill's motor strength and sensory index in both feet was normal. (*Id.*) He was diagnosed as having moderate pain in his right foot. (*Id.*) Dr. Labib opined that the pain was a result of Mr. Hill's arthritis and ankle surgeries. (*Id.*) Because of a previous staph infection, Mr. Hill was not a candidate for surgery. (*Id.*) Instead, Dr. Labib suggested that Mr. Hill undergo a biopsy of his ankle if he was unable to live with the pain. (*Id.*) If no infection was present, Dr. Labib could fuse Mr. Hill's subtaler joint to help with his arthritis, but this procedure would not serve to eliminate the pain in Mr. Hill's midfoot. (*Id.*) Dr. Labib recommended that Mr. Hill follow-up as needed and that he find a job with light duty that allows him to remain seated. (*Id.* at 293.)

On November 12, 2007, Mr. Hill visited Dr. Labib to undergo multiple surgical procedures. (*Id.* at 341.) Dr. Labib noted that Mr. Hill's preoperative diagnoses were: "advanced right ankle osteoarthritis," "possible right ankle osteomyelitis and septic arthritis," and right ankle stiffness secondary to the aforementioned conditions. (*Id.*) In an effort to alleviate some of Mr. Hill's pain in his right ankle, Dr. Labib performed a "right ankle open excision distal tibia spurring and debridement," "right ankle joint partial synovectomy and culture and sensitivity," and "unsuccessful right ankle arthroscopy." (*Id.*) His postoperative diagnoses were the same as those preoperative, with the exception that there was no evidence of osteomyelitis or septic arthritis. (*Id.*) Dr. Labib planned to await the results of bacteria, fungus, and acid-fast bacillus cultures; if they were negative, Mr. Hill would be a candidate for fusion. (*Id.* at 342.) The results were negative. (*Id.* at 319-21.)

When Mr. Hill returned for his post-operative visit on November 15, 2007, there was minimal swelling in his right foot. (*Id.* at 286.) He suffered from limited mobility and minimal, constant pain with movement that was a seven on a scale of ten. (*Id.* at 286-87.) He was told to return for a follow-up in two weeks and advised that a fusion would be planned after the results of his C+S were finalized. (*Id.* at 287.) Mr. Hill's

13

condition remained practically unchanged at the time of his visit on November 27, 2007. Indeed, he was still limited in terms of mobility and his right foot was still slightly swollen. (*Id.* at 281-82.) His pain, however, had decreased to a level six on a scale of ten. (*Id.* at 281.) He was diagnosed as suffering from severe right ankle osteoarthritis. (*Id.* at 282.)

On January 7, 2008, Dr. Labib performed a right ankle endoscopically-assisted fusion and a right proximal tibia bone graft harvest on Mr. Hill. (*Id.* at 311.) Mr. Hill's pre- and post-operative diagnoses were end-stage right ankle post-traumatic osteoarthritis. (*Id.*) Mr. Hill was advised to be strictly nonweightbearing for six weeks followed by a 3D boot for immobilization. (*Id.* at 313.)

Mr. Hill visited Dr. Labib on January 22, 2008, for a routine follow-up appointment. (*Id.* at 367.) After a physical examination, Dr. Labib noted that there was moderate swelling of Mr. Hill's right ankle; his left foot was normal. (*Id.* at 368.) Dr. Labib indicated that Mr. Hill was doing well and that his pain was well-controlled. (*Id.* at 367-68.) Consequently, he advised that Mr. Hill's cast would be removed in four weeks and his foot would then be placed in a 3D boot. (*Id.* at 368.) He recommended that Mr. Hill immobilize his foot using a below knee cast, that he not place weight on it, and that he return for a follow-up visit in four weeks. (*Id.*)

On February 19, 2008, Mr. Hill had an office visit with Dr. Labib. (*Id.* at 366.) He complained of a constant, aching pain of a level six on a scale of ten; prescription medication alleviated some of the pain. (*Id.*) He had not placed any weight on his foot. (*Id.*) Upon inspection, Dr. Labib noted that there was mild swelling in Mr. Hill's right ankle. (*Id.*) Dr. Labib advised Mr. Hill to discontinue use of his crutches in two weeks. (*Id.*) He was to wear a long boot during the day and night for six weeks, which coincided with the date of his next visit with Dr. Labib during which time he would have his foot x-rayed. (*Id.*) Finally, Dr. Labib recommended that Mr. Hill place weight on his foot only as tolerated. (*Id.*)

## B. *Grady Health System*

Mr. Hill was taken to the Grady Health System Emergency Department following his motor vehicle accident.[1] (*Id.* at 209-10.) The attending physician noted that, as a result of the accident, Mr. Hill had lost consciousness for a prolonged period of time, approximately thirty-five minutes. (*Id.*) He had to be extricated from his vehicle, and upon arriving at the hospital, he complained of pain in his right ankle and left thigh. (*Id.* at

---

[1] The medical records indicate that the visit occurred on January 9, 2007, though the actual date of the accident is January 13, 2007. While this discrepancy does not affect the Court's decision in any manner, the Court raises the matter in an attempt to clarify the documentation.

211.) "[P]lain films revealed a left femur fracture, subtrochanteric, and a right pilon fracture"; both Mr. Hill's right and left tibias were negative. (*Id.*) As a result of these injuries, Mr. Hill underwent an intramedullary nail placement for his left femur on January 14, 2007. (*Id.*) An external fixation device was also placed on his right pilon fracture. (*Id.*) He began physical therapy and was cleared at the wheelchair level on January 18, 2007. (*Id.*) He was discharged on January 19, 2007, in good, stable condition, with instructions to follow-up with physical therapy and the Orthopedic Surgery "B" clinic. (*Id.*) He was also prescribed pain medication. (*Id.*) Finally, he was to be weight-bearing as tolerated by his left lower extremity but non-weight bearing by his right. (*Id.* at 212.)

When Mr. Hill visited the Orthopaedic Clinic on January 31, 2007, he was doing well. (*Id.* at 217.) He was not in any pain and had not experienced any within the last thirty days. (*Id.*) He was told of the need to be weight bearing on his left lower extremity and advised to return for a follow-up visit in 4 weeks. (*Id.*) At that time, he would have x-rays done. (*Id.*) He returned on March 2, 2007,[2] and again indicated that he was not experiencing any pain and had not within the last thirty days.

---

[2] While the computer-generated date on the medical record is May 9, 2007, the handwritten note indicates that the date of service was actually March 2, 2007. (*Id.* at 251.)

(*Id.* at 239.) He was weight bearing as tolerated on his right lower extremity in his 3D boot. (*Id.* at 251.) He was told that he may require a fusion some time in the future and was told to return to the clinic in six weeks for x-rays. (*Id.*)

On April 17, 2007, Mr. Hill presented at the Grady General Surgery Clinic complaining that his peripherally inserted central catheter (PICC) line was clogged; though he experienced no pain, redness, numbness, or discharge, his right leg was swollen and tender. (*Id.* at 215.) He was referred to interventional radiology and told to return to the clinic in one week. (*Id.*) He was seen by an interventional radiologist on April 18, 2007, for a procedure involving his PICC line. (*Id.* at 256.)

Mr. Hill also visited the Orthopaedic Clinic on April 18, 2007. (*Id.* at 216.) The doctor noted that he was status post external fixation in his right pilon fracture and internal fixation on his left femur. (*Id.*) He noted that Mr. Hill had developed an infection in his right pilon, and that he had a reverse sural flap procedure performed on April 4, 2007. (*Id.*) Though at the time of the visit he experienced pain of a level two on a scale of ten, he was, overall, doing well. (*Id.*) Mr. Hill was told to return for a follow-up visit in three weeks. (*Id.*)

When Mr. Hill returned to the clinic on June 27, 2007, he was experiencing level 6-7 pain on a scale of ten. (*Id.* at 236.)

17

He was told to continue wearing the 3D boot as needed and that he could also utilize a cane for ambulating. (*Id.*) He was to follow-up in three months. (*Id.*)

## C. *Rehabilitation Physicians of Georgia, P.C.*

On February 27, 2008, Dr. Ernest L. Howard performed an independent medical exam on Mr. Hill and subsequently completed an impairment rating. (*Id.* at 29-31.) Initially, he noted that Mr. Hill had been involved in a severe car accident and that, as a result, had suffered "complex right ankle fracture, left femur midshaft fracture, status post multiple procedures including a myocutaneous flap transposition over the right posterior calf, right ankle procedures with fusion . . . ." (*Id.* at 29.) In addition, he indicated that Mr. Hill had been hospitalized for more than three months following an MRSA infection. (*Id.*) While there, he underwent four surgical procedures "for debridement [and] status post femur intramedullary nail." (*Id.*)

At the visit with Dr. Howard, Mr. Hill presented with "[j]oint pain, moderately severe persistent right ankle pain aggravated by his altered gait [and] left proximal femur pain with associated Trendelenburg gait deviation . . . ." (*Id.* at 30.) He used an axillary crutch to walk and reported difficulty ambulating secondary to his weight-bearing restrictions. (*Id.*) Additionally, he complained of numbness and tingling in his right ankle and thigh. (*Id.*) The sole of his foot was also numb, and

18

he stated that he was experiencing difficulty concentrating as a result of his pain. (*Id.* at 29.) Though he was taking Percocet to alleviate it, his overall pain score was 7/10. (*Id.*)

Mr. Hill indicated that he was able to sit for a total of thirty minutes, with the same period of time also representing the maximum amount that he could sit at one time. (*Id.*) He reported being able to stand for thirty minutes at a time. (*Id.*) His total time for standing and walking on any given day was two hours. (*Id.*) When he did so, however, he experienced throbbing, swelling, and pain throughout his right leg. (*Id.*)

In addition to his physical ailments, Mr. Hill informed Dr. Howard that he was depressed as a result of his prolonged hospital stay and resulting surgical procedures. (*Id.*) He was also experiencing reactive depression due to his belief that he would be unable to perform the types of activities and jobs that he was previously capable of completing. (*Id.*)

An examination revealed "lateral femoral cutaneous sensory distribution numbness left upper thigh, calcaneal sensory distribution numbness, decreased sensory discrimination over the lateral plantar distribution and Sural nerve distribution"; Mr. Hill had a "slight degree of varus at the ankle, 4° plantar flexion." (*Id.* at 30.) In his lumbar spine, he suffered from "[h]yperlordosis accommodating his lower extremity gait deviation and center of gravity accommodation for his fixed ankle." (*Id.*)

Finally, he exhibited a fixed ankle with only forefoot mobility; his extensor hallicus longus did not extend. (*Id.*)

Dr. Howard diagnosed Mr. Hill with "[s]taus post motor vehicle accident 1/13/2007," "gait deviation related to long bone fracture left femur intramedullary nail, slight leg length discrepancy, ankle fusion" and "[s]tatus post history of MRSA and protracted hospitalization with numerous procedures for I&D [incision and drainage]." (*Id.*) Consequently, he opined that Mr. Hill was unable to return to his previous job capacity. (*Id.* at 31.) He concluded by assigning Mr. Hill an impairment rating of

> moderate category of severity for lower limb impairment due to gait derangement: Requires routine use of cane or crutch and the use of an AFO or shoe orthosis adaptive equipment, 20% impairment of the whole person (leg length discrepancy related to femur fracture on the left, loss of gait determinant ankle range of motion and great toe push off of the forefoot, slight varus and plantar flexion fixed right ankle fusion.

*Id.*

On the same date, Dr. Howard submitted a Physical Capabilities Evaluation of Mr. Hill. (*Id.* at 344-47.) He stated that Mr. Hill could sit for thirty minutes at one time during an eight hour workday; this also represents the total time during an eight hour work day that Mr. Hill was capable of sitting. (*Id.* at 344.) Dr. Howard indicated that Mr. Hill could stand/walk for thirty minutes at one time during an eight hour workday; the total time that he was able to do so was two hours. (*Id.*) Dr.

20

Howard believed that Mr. Hill was capable of working for three and a half hours in an eight hour workday, though he required the "freedom to rest, recline, or lie down at his own discretion . . . ." (*Id.* at 345.) He stated that Mr. Hill could lift ten pounds occasionally and up to five pounds frequently. (*Id.*) And while Mr. Hill could use both his right and left hand for simple grasping, pushing/pulling, and fine manipulation, he could only use his left foot (not his right) for repetitive movements. (*Id.* at 345-46.)

He reported that Mr. Hill must elevate his legs above his heart several times each day. (*Id.* at 346.) While Mr. Hill was unable to squat, climb, or crawl, he could occasionally bend and frequently reach. (*Id.*) Additionally, Dr. Howard noted that Mr. Hill takes pain medication (Percocet) that would interfere with his ability to work. (*Id.*) He stated that Mr. Hill's condition was at the stated level of severity from at least the date that he suffered the injury, and was likely to last at least twelve continuous months. (*Id.*) It was Dr. Howard's belief that Mr. Hill's allegations of pain were consistent with the clinical findings. (*Id.*) Finally, he opined that Mr. Hill suffers from a 20% impairment of his whole person and that this impairment "could reasonably be expected to produce pain at a level which would preclude full-time, competitive work activity on a sustained basis." (*Id.*)

### *D.    Howard Colier, M.D.*

Dr. Howard Colier, a non-examining state agency physician, completed a physical residual functional capacity assessment (RFC) on July 3, 2007.  (*Id.* at 218-25.)  He indicated that Mr. Hill had a primary diagnosis of status post IM rod in his left femur, and a secondary diagnosis of status post external fixation in his right ankle and a status post pin tract infection in his right leg.  (*Id.* at 218.)  Dr. Colier opined that Mr. Hill would, within one year of his injuries, be able to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and found Mr. Hill's ability to push and/or pull unlimited, other than the aforementioned limitations.  (*Id.* at 219.)  He further stated that Mr. Hill would frequently be able to engage in activities requiring climbing a ramp/stairs, balancing, stooping, kneeling, crouching, and crawling.  (*Id.* at 220.)  However, he suggested that Mr. Hill only occasionally climb a ladder/rope/scaffolds.  (*Id.*)  Dr. Colier stated that Mr. Hill possesses no manipulative, visual, communicative, or environmental limitations.  (*Id.* at 221-22.)  He found the severity of the symptoms alleged by Mr. Hill to be only partly credible and suggested that Mr. Hill would resolve to the RFC one year from his alleged onset date.  (*Id.* at 223.)

### *E. W. Brenard Francis, Ph.D.*

On May 15, 2008, Mr. Hill saw Dr. W. Brenard Francis, a licensed psychologist. (*Id.* at 393.) On June 5, 2008, Mr. Hill again saw Dr. Francis. (*Id.* at 392.) During the visit, Mr. Hill stated that he does not wear short pants as he is self-conscious about the scars on his legs that resulted from the car accident. (*Id.*) He indicated that he spends the majority of his time at home and has difficulty adjusting to the fact that he is no longer employed. (*Id.*) He was remorseful and sad about the other individual in the accident who, unfortunately, had lost his life. (*Id.*) Indeed, Mr. Hill viewed the accident as "taking someone's life." (*Id.*) Dr. Francis opined that, though Mr. Hill was alert and coherent, he "manifested a remorseful mood with affect appropriate to thought content." (*Id.*) He suggested that Mr. Hill continue the therapeutic intervention and scheduled an appointment for later in the month. (*Id.*)

Mr. Hill returned on June 26, 2008. (*Id.* at 391.) He stated that he cried daily and felt rejected. (*Id.*) Dr. Francis noted that Mr. Hill "manifested a dysphoric mood with affect appropriate to thought content." (*Id.*) Mr. Hill stated that he was relieved to be able to express his feelings. (*Id.*) He was told to return at a later date for more intervention. (*Id.*) When Mr. Hill returned on October 2, 2008, Dr. Francis noted that, while he was alert and coherent, he was slightly anxious as

a result of personal issues. (*Id.* at 390.) He was told to continue the sessions and given an appointment for a follow-up visit. (*Id.*)

On December 4, 2008, Dr. Francis completed a Medical Assessment of Ability to Do Work Related Activities (Mental). (*Id.* at 376.) In terms of making an occupational adjustment, Dr. Francis stated that Mr. Hill's ability to follow rules, interact with a supervisor, and function independently was unlimited-very good. (*Id.* at 376-77.) His capacity for relating to co-workers, dealing with the public, using judgment, dealing with work stress, and maintaining attention and concentration was good. (*Id.*) In evaluating Mr. Hill's capability to make performance adjustments, Dr. Francis opined that Mr. Hill's ability to understand, remember, and carry-out simple job instructions was unlimited-very good; he is good at understanding, remembering, and carrying-out complex job instructions and detailed but not complex instructions. (*Id.* at 377.) Finally, Dr. Francis expressed that, in making social adjustments, Mr. Hill was unlimited-very good at maintaining personal appearance, relating predictably in social situations, and demonstrating reliability. (*Id.* at 378.)

## *F.  Harold Sours, M.D.*

Dr. Harold Sours, another non-examining state agency physician, completed a physical RFC on September 21, 2007. (*Id.*

at 240-47.) His findings were identical to those of Dr. Colier. He, too, found that Mr. Hill's symptoms were only partially credible. (*Id.* at 245.) While the symptoms were consistent with the MDI, Dr. Sours indicated that the severity and duration of the limitations was not. (*Id.*)

## 4. The ALJ's Decision

On March 27, 2009, the ALJ, applying the five-step analysis, 20 C.F.R. § 404.1520, found at step 1 that Mr. Hill had not engaged in substantial gainful activity (SGA) since January 13, 2007. (*Id.* at 18.) At step 2, the ALJ found that Mr. Hill suffers from a severe impairment – a history of ankle fracture and ankle pain. (*Id.*) However, the ALJ then found at step 3 that Mr. Hill's impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, including section 1.06. (*Id.* at 19.) In so finding, the ALJ noted that the objective medical findings failed to show that Mr. Hill has "non union of the right ankle fracture, or the left femur midshaft fracture." (*Id.*) Additionally, the ALJ noted that Mr. Hill uses a cane only on occasion. (*Id.*)

In assessing Mr. Hill's RFC, the ALJ determined that Mr. Hill has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb ropes, ladders, and scaffolds. He can frequently climb ramps and stairs. He occasionally uses a cane to help with ambulation. He can occasionally do crawling, crouching, stooping, and

balancing. He can frequently do kneeling, but can occasionally do ending [sic] and twisting at the waist. He has "fair" ability to maintain attention and concentration. He is "moderately limited" in ability to handle a regular work schedule. Fair in this case is defined as limited but satisfactory, and moderately limited is defined as a condition which affects but does not preclude the ability to function.

*Id.*

Further, the ALJ noted that, though Mr. Hill's impairments could be expected to produce some of the symptoms that he alleged, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residucal functional capacity assessment." (*Id.* at 20-1.) The ALJ specifically cited findings that despite the stiffness in his ankle, Mr. Hill's overall strength was normal, to refute his claims that he was unable to sit and walk for extended periods. (*Id.* at 21.) Additionally, the ALJ noted that Dr. Labib, in discussing Mr. Hill's ankle pain, failed to recommend that Mr. Hill abstain from all work activity. (*Id.*) Instead, the ALJ indicated, he advised that Mr. Hill "find employment that allows him to be seated with light duty." (*Id.*) The ALJ also noted that during the hearing, Mr. Hill did not appear to be in pain; "he was alert, understood, and responded to questions well." (*Id.* at 22.) He concluded by saying that "[i]t seems unreasonable that an individual suffering the pain and other symptamology alleged by the claimant would not seek more aggressive medical treatment to address the restrictive

26

pain of which he testified." (*Id.*)

At step 4, the ALJ found that Mr. Hill is incapable of performing past relevant work as a ramp agent and a commercial cleaner, janitorial supervisor. (*Id.*) Finally, at step 5, the ALJ considered Mr. Hill's age; education; work experience; and RFC to conclude that there exist jobs in significant numbers in the national economy that Mr. Hill can perform. (*Id.* at 23-4.) Therefore, the ALJ found that Mr. Hill was not disabled as defined by the Social Security Act. (*Id.* at 24.)

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 409 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the

Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an "accurate and logical bridge from the evidence to his conclusion" so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Sims v. Barnhart*, 309 F.3d 424, 429 (2002).

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for a POD and DIB must prove that he has a disability under the terms of the Social Security Administration (SSA). In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine

the claimant's RFC and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *(Id.)*

## DISCUSSION

Mr. Hill argues that the ALJ's decision must be reversed or remanded because: (1) he wrongly discounted the weight of the examining physician and (2) he failed to follow the social security guidelines in assessing credibility.

## 1. RFC Assessment

Mr. Hill maintains that, in formulating his RFC, the ALJ rejected the restrictions and limitations suggested by Dr. Howard, an examining physician, and, instead, relied solely on the medical opinions of two non-examining state agency physicians. Because the ALJ declined to accept Dr. Howard's medical opinion without the benefit of a contradictory opinion from a treating or examining physician, Mr. Hill contends that the ALJ's RFC is not based on substantial evidence. His case, thus, requires remand.

It is for the ALJ to determine which doctor to credit in instances where conflicting medical evidence exists. *Young v.*

*Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004)(citing *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)). In so doing, Social Security regulations require the ALJ to weigh many factors, including: the examining relationship; the treatment relationship (length of the relationship and the frequency of examination, as well as the nature and extent of the relationship); the amount of evidence that supports the opinion; the consistency of the opinion with the record as a whole; the speciality of the opining source, if any; and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(1)-(6). In weighing said factors, the regulations instruct the ALJ to, as a general matter, give more weight to the opinion of an examining source than to one who has not examined the claimant. 20 C.F.R. § 404.1527(d)(1). Because nonexamining sources have no examining or treating relationship with the claimant, the actual weight afforded their opinions depends on the degree to which they provide explanations in support of them. 20 C.F.R. § 404.1527(d)(3). "Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge . . . level of administrative review." SSR 96-6p, 1996 SSR LEXIS 3 (July 2, 1996). The ALJ

must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the Social Security Administration].

20 C.F.R. § 404.1527(f)(2)(ii).

The ALJ, contrary to the opinion of Dr. Howard, found that Mr. Hill is capable of performing light work. In formulating this RFC, he rejected Dr. Howard's stated belief that Mr. Hill is able to work for a total of only three and a half hours each day and must be given the freedom to rest, recline, or lie down at his discretion throughout the workday. The ALJ's RFC is also inconsistent with Dr. Howard's finding that Mr. Hill is required to elevate his legs above his heart several times a day and his opinion that Percocet interferes with Mr. Hill's ability to work. Mr. Hill argues that the RFC is not supported then by substantial evidence. His argument, however, lacks merit.

As an initial matter, contrary to Mr. Hill's assertions, there exists in the record, medical evidence that is contradictory of Dr. Howard's opinion. And it is not just the opinions of the two state agency physicians - Dr. Colier and Dr. Sours. Indeed, the ALJ indicated that he relied on as much. Specifically, in formulating his RFC, the ALJ cited to medical documentation submitted by Dr. Labib, a physician who treated Mr. Hill on several occasions, in which he opined that Mr. Hill could

perform "light duty" work. While the Court acknowledges that Dr. Labib's opinion was provided in response to the fact that Mr. Hill was not being paid disability benefits, it does not detract from the fact that Dr. Labib failed to place any restrictions whatsoever on said "light duty" work. And because none of Mr. Hill's treating physicians provided a statement regarding his specific limitations, it is entirely reasonable that the ALJ considered this evidence and, in light of it, declined to adopt Dr. Howard's opinion that Mr. Hill is precluded from working full-time, and chose instead to give "some weight" to the opinion of the state agency physician, who, like Dr. Labib, failed to note any work restrictions. Mr. Hill concedes that the "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record . . . ." *Gudgel v. Barnhart*, 245 F.3d 467, 470 (7th Cir. 2003). Here, in rejecting the limitations imposed by Dr. Howard, after finding that Mr. Hill's treating physician indicated that he could perform "light duty" work without noting any restrictions, the ALJ did exactly that.

Mr. Hill seemingly argues that there exists a *per se* rule that the opinions of an examining source are to be routinely accepted over those of a nonexamining source. Not surprisingly, Defendant disagrees and in so doing, relies on *Hofslien v. Barnhart*, 439 F.3d 375 (7th Cir. 2006) for support. In *Hofslien*,

the claimant appealed "the district court's refusal to disturb the decision by an administrative law judge denying her application for social security disability benefits." *Id.* at 376. In making its determination, the district court, like the ALJ, declined to give controlling weight to the opinions of the claimant's treating psychologist because they were inconsistent with other medical evidence. *Id.* Instead, the court (and the ALJ) adopted the opinions of a medical expert as well as two state agency psychologists.[3] The claimant argued that the "treating physician" rule had been misapplied as the opinions of her treating psychologist was not given controlling weight. *Id.* The Seventh Circuit, however, held that in instances where contradicting evidence is introduced, the presumption that the treating physician's opinion is entitled to controlling weight "drops out" and the evidence is no longer entitled to controlling weight. *Id.* Rather, it becomes "just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377.

Defendant's reliance on *Hofslien* is misplaced, but not for the reason alleged by Mr. Hill. The fact that in the case at bar (as opposed to in *Hoflsien*), no medical expert testified at Mr. Hill's hearing, is a distinction without a difference. To be

---

[3] The factual background of the *Hofslien* case is presented in greater detail in an unpublished order issued together with the cited opinion. *See Hofslien v. Barnhart*, No. 05-2649, 172 Fed. Appx. 116 (7th Cir. 2006).

sure, "a medical expert is a nonexamining source." *Osborn v. Astrue*, No. 08 C 7395, 2010 U.S. Dist. LEXIS 69690, at *25 (N.D. Ill. July 12, 2010). Consequently, for all practical purposes, there is no difference between the medical expert in *Hofslien* and the state agency physicians in the case at bar — neither examined the claimant. The true difference between *Hofslien* and Mr. Hill's case is that *Hofslien* dealt with the weight to be afforded the medical opinions of a treating physician. As mentioned *supra*, no treating physician submitted a medical opinion regarding Mr. Hill's limitations. But despite this difference, the Court notes that, even when dealing with the weight to be given treating sources — opinions that are generally given the greatest amount of weight — the Seventh Circuit declined to adopt a bright line rule that these opinions govern in instances where a contradictory opinion of a nonexamining source is also presented, or vice versa. In fact, the Seventh Circuit found that the ALJ's decision to afford greater weight to the opinions of the nonexamining sources (as opposed to those of the treating physician) was supported by substantial evidence and, therefore, affirmed the district court's judgment. *Hofslien*, 439 F.3d at 377.

Nor is the Court convinced that the ALJ's adoption of the opinion of Dr. Sours constitutes reversible error because Dr. Sours was not privy to: the results of a CT scan that showed

possible right ankle osteomyelitis, information that Mr. Hill had undergone right ankle arthroscopy surgery, a diagnosis by Dr. Labib that Mr. Hill suffered from severe ankle osteoarthritis, and an instruction that Mr. Hill be non-weightbearing for six weeks following a right ankle fusion and right proximal tibia bone graft. The Court can dispose of Plaintiff's argument regarding the possible osteomyelitis in short order because, though the CT scan showed the possibility, the condition was effectively ruled out by Dr. Labib on November 12, 2007. The Court concedes that Dr. Sours was unaware of the arthroscopy surgery that Plaintiff underwent. However, as discussed *supra*, the treating physician, Dr. Labib, failed to note any restrictions on Mr. Hill's ability to do work, either before or after the surgery. And the state agency physician acknowledged that Mr. Hill suffered from severe arthritic changes. Finally, Mr. Hill has failed to show how Dr. Labib's directive that he be non-weightbearing for six weeks following surgery bolsters his argument that he was likely to suffer from disabling limitations for at least twelve months.

The Court is not permitted to "reweigh the evidence. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ." *Herr*, 912 F.2d at 181(citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); *Reynolds v.*

*Bowen*, 844 F.2d 451, 454 (7th Cir. 1988)). By indicating not
only the reasons why he gave Dr. Howard's opinion less weight,
but also why he gave Dr. Sours' opinion some weight, the ALJ
fulfilled his responsibility and "buil[t] an accurate and logical
bridge between the evidence and the result." *Steele v. Barnhart*,
290 F.3d 936, 941 (7th Cir. 2002)(quoting *Dixon v. Massanari*, 270
F.3d 305, 307 (7th Cir. 2001)). Because the ALJ's decision is
supported by substantial evidence, the Court declines to remand
the case on this basis.

## 2. Credibility Finding

Mr. Hill argues that the ALJ's failure to comply with Social
Security Regulation 96-7p in making his credibility finding
requires the Court to remand his case to the ALJ.

In evaluating credibility, the ALJ must "consider the entire
case record, including the objective medical evidence, the
individual's own statements about symptoms, statements and other
information provided by treating or examining physicians or
psychologists and other persons about the symptoms and how they
affect the individual, and any other relevant evidence in the
case record." SSR 96-7p, 1996 SR LEXIS 4, *3 (July 2, 1996).
The ALJ's determination "must contain specific reasons for the
finding on credibility, supported by the evidence in the case
record, and must be sufficiently specific to make clear to the
individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *3-4. Because the ALJ has the opportunity to observe the claimant testifying, his credibility finding is entitled to special deference. *Castile v. Astrue*, 617 F.3d 923, 929 (Aug. 13, 2010)(citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Rather than nitpick the ALJ's opinion, the Court will give it a commonsensical reading. *Id.* Consequently, the determination will be disturbed only in the event that it is patently wrong. *Id.*

Contrary to Mr. Hill's assertions, the ALJ did provide specific reasons for his credibility finding. Specifically, he found that Mr. Hill's statements concerning the intensity, persistence and limiting effects of his impairments are not credible. In making this determination, the ALJ relied on, *inter alia*, Dr. Labib's statement regarding Mr. Hill's ability to perform "light duty" work (discussed *supra*) as well as the fact that, during the hearing, Mr. Hill did not appear to be in pain, and "was alert, understood, and responded to questions well." Additionally, the ALJ considered Mr. Hill's "prescription for only mild to moderate pain, failure to sustain consistent treatment, and or lack of hospitalizations." He opined that it is "unreasonable that an individual suffering the pain and or other symptomatology . . . would not seek more aggressive medical

treatment to address the restrictive pain of which he testified."

Nor was the ALJ required to seek clarification from Dr. Labib because he relied on Dr. Labib's statement that Mr. Hill can perform "light duty" work, though this language is allegedly open to multiple interpretations. An ALJ must recontact medical sources only where the evidence received is not sufficient to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1512(e). In the case at bar, the evidence was sufficient for the ALJ to decide that Mr. Hill is not disabled. The ALJ was well within his rights, therefore, not to request additional information from Dr. Labib. Indeed, the ALJ did not rely solely on the statement of Dr. Labib, but also looked to, *inter alia*, Mr. Hill's treatment record, which shows little consistent treatment for pain. Something that one would not expect to see if the pain was truly as disabling as Mr. Hill alleged it was. Consequently, this Court cannot say that the ALJ's decision was patently wrong and, thus, declines to remand on this ground.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

Date: December 1, 2010      E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

39